**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 05a0882n.06
Filed: November 3, 2005

**No. 04-4033**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| STEPHEN G. ANDERSON, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| RAVENNA TOWNSHIP FIRE | ) | NORTHERN DISTRICT OF OHIO |
| DEPARTMENT, RAVENNA TOWNSHIP | ) | |
| BOARD OF TRUSTEES, DONALD M. | ) | |
| BECKETT, individually and in his official | ) | |
| capacity, ROBERT CHERRY, individually | ) | |
| and in his official capacity, RANDY | ) | |
| PORTER and MARK STANKIEWICZ, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before: NELSON and SUTTON, Circuit Judges; ZATKOFF, Senior District Judge.[*]

ZATKOFF, Senior District Judge. Stephen Anderson, a former employee of the Ravenna

Township Fire Department (Department), appeals the district court's decision granting the

Defendants' motion for partial summary judgment on Anderson's claims that his discharge was in

retaliation for complaints he made to his supervisors regarding age and sex-based harassment and

engaging in union-oriented speech protected by the First Amendment. For the reasons set forth

---

[*] The Honorable Lawrence P. Zatkoff, United States District Judge for the Eastern
District of Michigan, sitting by designation.

herein, we affirm.

I.

When the Ravenna Township Board of Trustees (Board) decided to add four full-time firefighters to the Department in 2001, Anderson and three other persons were hired to fill those spots. Like the other new hires, Anderson was hired as a probationary firefighter for a one-year term, during which time he could be dismissed for not completing his one-year probation in a satisfactory manner.

The Department had a harassment policy (the "Policy") in effect at all times Anderson was employed by the Department. The Policy was updated, as Anderson was aware, in January 2001. Among other rules, the Policy prohibits harassment of a sexual nature and/or on the basis of age. The Policy provides, in relevant part:

> Harassment on the hob [sic] is unacceptable. In the event an employee believes they [sic] are the subject of harassment, or other improper conduct, the following procedure shall apply:
>
> a. Inform the supervisor, who will review and analyze the content of the allegation, or the factors of the specific incident.
>
> b. If the employee feels that the supervisor is responsible for the harassment, the employee shall report the event to the supervisor of the person involved.
>
> c. The complaint may be informal, in an attempt to stop a simple problem, or clarify a situation. This can be handled at the supervisory level, consistent with the penalty below.

Notwithstanding the Policy, Anderson, several of the individual defendants and other

2

Department employees testified in their depositions that off-color humor, sexual comments and jokes, excessive cursing, offensive acts and comments, obscene pictures, public nudity, touching and violations of rules and regulations were commonplace at the Department. The Chief of the Department, Donald Beckett, claims that he did not sanction this behavior but was aware of it. Lieutenant Randy Porter said such conduct was permissible so long as no one complained about it.

Some of this misconduct and behavior was directed at Anderson. Anderson cites the following instances: (1) Porter would jump out from behind fire trucks to scare Anderson, (2) firefighter Heather Sweitzer placed mud-soiled "Depends" diapers in Anderson's gear in reference to his status as the oldest EMT, (3) Sweitzer placed a photograph of a naked woman with water spewing out of her rectum on a Department vehicle (Beckett originally accused Anderson of this act), (4) Lieutenant Mark Stankiewicz routinely made remarks about Anderson wearing adult diapers and using a motorized wheelchair, (5) Stankiewicz altered a photo to show an elderly man eating feces, engaging in anal sex, wearing diapers and riding in a motorized wheelchair, (6) Stankiewicz put adult diapers in Anderson's locker and singled Anderson out for "offensive" physical harassment, and (7) firefighter Mike Goodwin made negative references to Anderson's age and physically harassed Anderson. Anderson asserts that he invoked the Policy when making "numerous complaints up the chain-of-command to the officers and Chief Beckett about the ageist and sexual harassment perpetuated by his fellow firefighters and officers." Anderson states that there was then a lull in the harassment at one point after Beckett admonished his officers but that the harassment began again shortly thereafter.

The record also is replete with instances of inappropriate comments and/or actions of

3

Anderson which he either admitted or did not deny. For example, Anderson is accused of, among other things, (a) discussing a visit to a brothel in front of female employees, (b) saying "let's see what pops up" in reference to his penis, (c) asking female employees whether they "would like to feel old age creeping up on them?," (d) bringing in pictures from the internet which were sexual in nature, and (e) referring to a female colleague as a whore.

At the end of July and beginning of August 2001, Anderson spoke with two Board members, Patricia Artz and Defendant Cherry, on separate occasions. Anderson spoke to Artz regarding morale problems in the Department. It is unclear what the subject of his discussion with Cherry was, but the record is devoid of any indication that Anderson mentioned the alleged age or sexual harassment to either Artz or Cherry. On August 13, 2001, Stankiewicz forwarded a written complaint to Beckett about Anderson, complaining about Anderson's conduct in the workplace and Anderson's complaints about Porter, Goodwin and Sweitzer. Porter drafted a similar, undated memo criticizing Anderson's conduct. On August 30, 2001, Anderson received a performance evaluation from Beckett. His overall score was 4 out of 5. He was downgraded in the areas of "communication skills" and "internal relations." Anderson disagreed with those two assessments, believing that they were the result of Porter, Sweitzer, Stankiewicz and firefighter Holly Smith making "complaints" about him even though they "continued to harass him despite his complaints to . . . Beckett and the other officers." During the August 30 performance evaluation, Beckett warned Anderson about his inappropriate talk and instructed Anderson to apologize to people he may have offended.

On September 1, 2001, Sweitzer filed a written complaint about Anderson with Assistant Chief Randy Quay ("Quay") regarding an incident where she called for assistance with a patient on

an EMS run. Anderson, then the EMS coordinator, responded to the call and took over care for the patient. In her complaint to Quay, Sweitzer stated that she felt Anderson made her look incompetent when he took over care of the patient.

On September 5, 2001, Beckett prepared a "Notice of Employee Counseling" and placed it in Anderson's personnel file but did not deliver it to Anderson. Anderson met with Beckett on September 13, 2001, to discuss a number of items in the Notice. Among other things, Beckett told Anderson to: (a) discontinue inappropriate talk about "body parts," comments of a sexual nature and excessive cursing in the workplace, (b) discontinue attitude toward co-workers that they can't function to his level of emergency service as they need support to develop, (c) focus on being a good firefighter/paramedic and team player while Beckett reclaimed the EMS Coordinator duties, and (d) not retaliate against other employees as a result of this "counseling."

On October 29, 2001, Beckett forwarded correspondence to the Board in which he said he wanted to dismiss Anderson from the Department after the elections but prior to the expiration of Anderson's probationary period. Topics mentioned in that correspondence included: (1) co-workers did not want to work with Anderson or his "abrasive" personality ("I have employees complaining about working with Steve on a daily basis"), (2) Anderson was carrying around the tape recorder and recording as many comments and discussions as possible, (3) Anderson "is currently organizing the full-time employees with an attempt to bring the 'Union' in to our Department. He knows that if the union gets him, it would afford him a little more protection," and (4) Anderson "has abandoned all of his duties at the Department. I am doing all the EMS work and training."

On November 11, 2001, Anderson found a reference to a document on the Department

5

computer titled "Complaints about Anderson." Anderson was upset about this and, because he could not locate the document, began demanding of employees the whereabouts and content of this document. On November 12, 2001, Beckett prepared a memo to Anderson about "disruption of the Department" based on complaints of other employees that Anderson was interrogating them and tape recording conversations. The memo indicated that further reports of such conduct may result in disciplinary action. Anderson claims not to have received the memo until after he was fired. On November 13, 2001, Cherry responded to the November 12, 2001, memo by ordering Beckett to investigate the tape recorder/interrogation issues. On November 15, 2001, Beckett notified Anderson that he was conducting a personal conduct investigation at the direction of the Board and that Anderson was suspended, with pay. Later that day, Beckett provided the Board with the results of the investigation. On November 27, 2001, Beckett told Anderson he could resign with a good reference or be fired. Anderson refused to resign and effective November 30, 2001, Anderson's probationary employment was terminated by the Board.

On November 8, 2002, Anderson filed a nine count complaint stemming from the alleged harassment and discrimination he endured at the Department. Anderson asserted that his termination was in retaliation for his complaints about age and sex-based harassment, as well as engaging in attempts to organize a union at the Department. The Defendants filed a motion for summary judgment on all counts except Count VIII, and the district court granted their motion. Count VIII was subsequently settled and dismissed with prejudice.

II.

We review *de novo* a district court's entry of summary judgment. *DiCarlo v. Potter*, 358 F.3d

6

408, 414 (6th Cir. 2004).

A.

O.R.C. §4112.02(I) provides that it is an unlawful discriminatory practice:

> For any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code.

In order to establish a prima facie case for retaliation under O.R.C. §4112.02, a plaintiff must show (1) he engaged in a protected activity, (2) his employer knew of this exercise of his protected rights, (3) he was the subject of adverse employment action, and (4) a causal link existed between the protected activity and the adverse action. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000); *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 831 (6th Cir. 1999).

The district court granted summary judgment in favor of the Defendants on Anderson's retaliation claim because Anderson never made any of the Board members aware of the alleged harassment he endured from his co-workers. The record is clear that the Board had no knowledge of Anderson's claims of age and sexual harassment. While Anderson talked with Cherry and Artz in late July/early August 2001, he admits he never discussed with them or any other Board member any issues Anderson allegedly had with respect to age or sexual harassment.

On appeal, Anderson asserts that the Board's lack of awareness of his protected activity is inconsequential because the Board is vicariously liable. Anderson contends that because he

7

complained about these issues to Beckett, who was his immediate supervisor and the person with authority over Anderson, Beckett's knowledge is imputed to the Board. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 801-07 (1998) (the City of Boca Raton was "subject to vicarious liability to a victimized employee [pursuant to §219(2)(d) of the Restatement (Second) of Agency] for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee"). We find that Anderson's reliance on *Faragher* is misplaced.

In *Faragher*, the Supreme Court found that there was vicarious liability under the following circumstances: (1) female city lifeguard plaintiff alleged, and district court found, sexual harassment by her male supervisors when supervisors repeatedly subjected plaintiff and other female lifeguards to "uninvited and offensive touching," made lewd remarks, and spoke of women in offensive terms, (2) the supervisors "were granted virtually unchecked authority" over their subordinates, "directly controll[ing] and supervis[ing] all aspects of [plaintiff's] day-to-day activities," (3) the plaintiff and her colleagues were completely isolated from the city's higher management, (4) the city adopted a harassment policy but there was no evidence that the policy was disseminated to the plaintiff or her colleagues, or even the defendant supervisors, (5) the city (and the department in which plaintiff worked) had a clear chain of command, (6) the harassment was pervasive enough to support an inference that the city of Boca Raton had "knowledge or constructive knowledge" of it, (7) the supervisors were acting as agents of the city when they committed the harassing acts, and (8) a third, uninvolved supervisor had knowledge of the harassment and did not report it to city officials. *Id.* at 780-83, 808.

Numerous critical factual differences distinguish the instant case from the *Faragher* decision.

The Board had sole authority to hire and fire members of the Department, and the Board was not an isolated, amorphous body with whom Department employees (such as Anderson) had no familiarity. To the contrary, Anderson himself spoke to at least two of the three Board members in the summer of 2003 regarding concerns Anderson had with respect to the functioning of the Department. In addition, unlike the city of Boca Raton, Ravenna Township had a Policy in place and the Policy had been passed out to the members of the Department, including Anderson. Further, while the Boca Raton case involved a clear chain of command, the Policy specifically provided that an employee could bypass his or her supervisor(s) if the employee felt that such supervisor(s) was the source of the perceived misconduct. Accordingly, we find that *Faragher* does not govern the instant case. Anderson's reliance on *Genaro v. Central Transport, Inc., et al.*, 84 Ohio St.3d 293, 703 N.E.2d 782 (1999), fails for the same reason.

B.

A prima facie case of First Amendment retaliation pursuant to 42 U.S.C. §1983 requires that a plaintiff demonstrate (1) he engaged in constitutionally protected activity, (2) defendant's adverse action caused him to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in the activity, and (3) the adverse action was motivated, at least in part, as a response to his exercise of his constitutional rights. *Farhat v. Jopke*, 370 F.3d 580 (6th Cir. 2004); *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000). The plaintiff must also demonstrate that his speech touched on matters of public concern, and the employee's "interest in commenting upon matters of public concern [must] outweigh[] the interest of the State, as an employer, in promoting the efficiency of public services it performs through its employees." *Cockrel v. Shelby County*

9

*School Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001).

Established law provides that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick*, 461 U.S. at 147. Moreover, this Court has held that "[a]n employee's speech, activity or association, merely because it is union-related, does not touch on a matter of public concern as a matter of law." *Akers v. McGinnis*, 352 F.3d 1030, 1038 (6th Cir. 2003) (*citing Boals v. Gray*, 775 F.2d 686, 692 (6th Cir. 1985)).

Anderson provides no support or even an argument for how his discussions with Sweitzer regarding the organization of a union constituted a matter of public concern. Rather, to the extent that Anderson was engaged in any discussions regarding the formation of a union, such formation was for his (and other employees') personal benefit, not the public's. Moreover, the record lacks any evidence which would demonstrate that the decision to terminate Anderson was motivated by his union activity. Finally, contrary to Anderson's assertions, Beckett's October 29, 2001, memo to the Board does not demonstrate that the adverse action was motivated by Anderson's exercise of his right to engage in union activity, only that Anderson would have more protection from termination if the union existed. Accordingly, the district court's dismissal of Anderson's claim of retaliation for exercising his First Amendment rights is affirmed.

C.

Finally, as set forth in Part B. above, Anderson has failed to demonstrate that there was any violation of his constitutional rights. As such, he cannot overcome the individual defendants' defense of qualified immunity with respect to being sued in their individual capacities. *See Wilson v. Layne*, 526 U.S. 603, 609 (1999)*; Gragg v. Kentucky Cab. For Workforce Dlvp.*, 289 F.3d 958, 964 (6th Cir. 2002) (in order to "prevail against a defense of qualified immunity, a plaintiff must first establish the constitutional right that she claims was violated by the defendants.").

III.

For these reasons, we affirm.